## KING and VERPLANK *vs*. ROOT.

A publication by the editors of a newspaper affecting the character of a *candidate* for public office is not a *priviledged communication* relieving, the publishers from the necessity of proving the truth of the charges made, to shelter themselves from damages, and casting the *onus probandi*, upon the party slandered of shewing actual malice, or a knowledge of the falsity of the charge. Editors may publish what they please in relation to the character and qualifications of canditates for office, but they are responsible for the *truth* of the publication.

The *belief* of the defendants in the truth of the charges contained in the publication does not destroy the presumption of *malice*. Malice need not be proved, but will be implied if the charge be *false*; and in determining the question of justification, the *motives* of the defendant will not be taken into consideration.

*Malice*, said to be the *gist* of the action in suits for libel or verbal slander, does not mean malice, or ill will towards the individuals affected, in the ordinary sense of the term. In ordinary cases of slander, the term *maliciously*, means *intentionally*, and *wrongfully*, without any legal ground of excuse. Malice is an implication of law from the false and injurious nature of the charge, and differs from *actual malice* or *ill-will* towards the individual, frequently given in evidence to enhance the damages.

In ordinary cases of slander or libel, it is not necessary to allege in the declaration that the words were spoken or the publication made *maliciously*; it is sufficient to aver that it was done falsely and injuriously.

ALBANY,
Dec. 1829.

King
v.
Root.

*Priviledged communications* are *prima facie* excusable, from the cause or occasion of the speaking or writing; but even in the case of such communications an action will lie if the party making the communication knows the charge to be false, and adopts that mode of gratifying his ill-willor malice. In such case, however, *actual malice* must be shewn, and the question will be submitted to a jury: in ordinary slander the question of *malice* is never submitted to a jury, except as to the amount of damages.

If a plaintiff has been injured in his character or feelings by an unauthorized publication, it is the duty of a jury to award him a full compensation in damages without reference to any particular ill-will entertained against him by the defendant. *Ill-will* or *malice* will enhance the damages, but need not be shewn to entitle a plaintiff to a recovery.

The truth of the publication may be pleaded in bar of the action, but if the defence thus set up be not supported by proof, the defendant will not be allowed to allege that the charge was made under a mistake, and to support such allegation by evidence; such proof will be received as tending to reduce the damages by rebutting the presumption of malice where the *general issue* only is interposed, but not where a justification has been set up.

Evidence of the *general character* of a plaintiff may in all cases be given by a defendant in an action of slander or for libel to lessen damages, even where a *justification* has been attempted. So on the other hand, the plaintiff is at liberty to give evidence of *actual malice* and vindictive motives on the part of the defendant to enhance the damages. The defendant however, in such case, may rebut all presumption of actual malice by shewing the facts and circumstances which induced him to believe the charge to be true when made, although it afterwards turns out to be false.

Evidence of the opinions of others, as to the truth of the charges made, is inadmissible, if in the publication the defendants state what they publish as facts within their own knowledge, without reference to the opinions of others.

The CHANCELLOR delivered an opinion in favor of an affirmance, and Mr. Senator MATHEW in favor of a reversal of the judgment of the supreme court.

ERROR from the supreme court. Root sued King and Verplank, editors of the *New-York American*, a newspaper printed in the city of New-York, for a libel published in that paper. The libel was in the following words:

" *Lieutenant Governor Root.*—It has been denied, we understand, by the *Argus*," &c., " in answer to some strictures on the subject in an *Albany* paper, that on the afternoon of his famous decision of order, Mr. Root was intoxicated; and the charge is treated as calumnious," &c.

" The facts are shortly these; We speak only what we saw; and as it is a matter of some public concern, that the

presiding officer of our senate should not continue to be what Mr. Root is, we speak without hesitation or reserve.

" The house of assembly having sent to the senate the resolution declaring the expediency of passing, at the then session, an electoral law, it was anticipated that some interesting proceedings would, in consequence, be had in that body. Accordingly, when it met at five o'clock in the afternoon, to which hour it had in the forenoon, previously to the passage of the resolution in the assembly, adjourned, a great concourse of citizens, and of strangers, from all parts of our country, crowded its floor, lobbies and gallery. When the lieutenant governor, at the hour named, advanced through the centre of the apartment towards his chair, there was in his appearance, manner, and walk, something that excited every one's observation. He reached his station, however, and calling the members to order, informed them that there was a message from the assembly, which the clerk then read. A dead silence ensued. Lieutenant governor Root, holding on to each arm of his chair, looked round with inflamed face, with blood-shot eyes, and half open mouth, and with an expression altogether so stolid and drunken, as in any other situation, and under other circumstances, could not have failed to excite the derision of all present.

" He was evidently expecting some motion previously concerted, probably in order to enable him to pour forth his diatribe with which he was laboring; but none such was made, and he, therefore, was compelled to remark, ' the chair has no observations to offer, unless some motion be proposed.' Thereupon, it was moved by Mr. Burt, we believe, at any rate by some one opposed to the faction, ' that the senate concur in the resolution sent from the assembly.'

" This furnished the spark to the combustibles smouldering in the breast of the lieutenant governor ; instantly he essayed to rise, and by the all-important aid of the arms of his chair and his desk in front, he did rise, and stood for a moment, as if in preparation, silent before several hundreds of his fellow citizens, an object, from his appearance and man-

ner, we will venture to say, of loathing and disgust to every unprejudiced man among them; unwashed, unshaven, haggard, the tobacco juice trickling from the corners of his mouth to be wiped away by his coat sleeve; with unsteady footing, this second officer of the great state of New-York, commenced his address to the senate. It is known that the presiding officer of this body has no other than a casting vote, and no right at all to speak. He may, however, assign reasons for any decision he makes; and under this shallow pretext, Mr. Root uttered a long and labored vindication, not only of the course he was about to take in declaring the motion for concurrence out of order, but of the whole course of proceedings of the senate; and then launched forth into a regular phillippic against the governor and assembly, whom he charged with vying with each other in the race of popularity. It was the harangue of an intemperate demagogue, blind with passion and rum. As such it was heard by all impartial men: and our only astonishment was, that the respectable members of the senate could sit still, and permit their presiding officer thus to disgrace himself and them. He should have been called to order, and compelled to sit down. He was doing what he had no more right to do than any grovelling sot from the public kennel. He was out of order in presuming *to address the senate at all; but to address them in his then state, and in the terms he did, was outraging all order, decency and forbearance.*"

The defendants pleaded the general issue, to which they attached a notice in these words, to wit: " Sir: Take notice, that according to the statute in such case made and provided, the defendants in this case will insist upon and give in evidence in bar of the plaintiff's action at the trial of this cause, that on the fifth day of August, in the year of our Lord one thousand eight hundred and twenty four, the said plaintiff did not conduct, demean and deport himself as lieutenant governor of the state of New-York, and president of the senate as aforesaid, properly, orderly, decently and soberly. And they will further give in evidence that the said

plaintiff, at the time and place aforesaid, was intoxicated and drunk, a disgusting and loathsome object; and that there was something in his air and manner that excited every one's observation as he advanced towards the chair in the senate chamber. And they will further give in evidence that at the time and place aforosaid the said plaintiff was acting as president of the senate as aforesaid, and that the plaintiff, when acting in that capacity, by the ordinary rules of that body was not qualified to address the senate in the manner that he did; that at the time and place aforesaid the said plaintiff made a harangue very discreditable to the station of president as aforesaid, and that his conduct and appearance on the occasion aforesaid were derogatory to the said station, and such as to create a belief that the said plaintiff was intoxicated. And the said defendants will further give in evidence that during the month of August aforesaid a session of the legislature was held at Albany, to wit, at Delhi, in the county of Delaware; and that at the said session, viz. on the said fifth day of August, a resolution, which had received the sanction of the house of assembly of the state of New-York, was sent to the said senate for its concurrence, and that upon a motion being made in the said senate for its concurrence, the said plaintiff declared the said motion to be out of order, and uttered a violent harangue on that occasion, in which the said plaintiff prostituted the dignity of his station; and that the conduct and appearance of the said plaintiff on the occasion last aforesaid were such as to induce the belief that he the said plaintiff was intoxicated, and were highly disgraceful to himself and to the station of the said plaintiff, and were such as to warrant the charges made against the said plaintiff in the said alleged libel. And they will further give in evidence that the matter charged as libellous in the said supposed libel is true; and further, that the said supposed libel was published with good motives and for justifiable ends. And they will further give in evidence that the said plaintiff was often drunk and intoxicated when in the discharge of his legislative duties, and that the said plaintiff has been often drunk and intoxica-

ALBANY,
Dec. 1829.

King
v.
Root.

ted when acting as president of the senate aforesaid, and that the said plaintiff is an habitual drunkard."

The cause was tried at the Delaware circuit in June, 1826, before the Hon. SAMUEL R. BETTS, then one of the circuit judges. The publication of the alleged libel was admitted, and that it was written by Charles King, one of the defendants. A number of witnesses were examined as well on the part of the defendants as on the part of the plaintiff as to the conduct, condition, manner and appearance of the plaintiff upon the occasion alluded to in the publication. The testimony of these witnesses it is deemed unnecessary to state, as the substance of it is given in the charge of the circuit judge, stated below. On the cross-examination of one of the plaintiff's witnesses, he was asked as to his inexperience of the general habits of the plaintiff for temperance, which inquiry was objected to, and the judge decided that evidence of the plaintiff's general habit was inadmissible. Another question put to this same witness, viz. how often he had seen the plaintiff intoxicated, and to what degree, was also objected to and overruled; to which decisions the defendants excepted.

The evidence on both sides being closed, the counsel for the defendants did insist, that the occupation of the defendants, the plaintiff's official station, the remarks themselves, and the proof offered in support thereof, made out a sufficient justification of the alleged libel, and showed a good and sufficient motive for their publication; that the current opinion and belief at the time in Albany, and amongst the spectators in the senate, the fifth of August, eighteen hundred and twenty-four, justified the remarks; or that if a verdict should be found for the plaintiff, the malice of the publication was taken away, and only nominal damages could be awarded; that the belief of the defendants in the truth of the charge was proved by the evidence, and did away the presumption of malice; that the general character of the plaintiff for intemperance was such, that no injury was sustained by the publication in question, and only nominal damages should be awarded, and prayed his honor the judge to charge the jury accordingly.

The judge, however, charged the jury as follows:

*"Gentlemen of the Jury,*

"I am happy, at this late hour of the night, to assure you, that in the discharge of the duty imposed upon me, I shall not be required to detain you long, as I shall not feel it necessary to do more than lay before you a general outline of the case, which it will then become your province to determine. The proofs and discussions disclose an important and delicate case for our decision; it is a controversy of the bitterest character between men of high personal influence and consideration, and of differing political sentiments. The one party has long filled important and influential stations in society; has been the subject of much public notice, sometimes of a friendly and applauding character, at others of the most severe and criminatory. The other parties are men of commanding talents and accomplishments, conducting a paper of distinguished repute and extensive circulation; and both parties, from their political relationship and personal connexions, possessing an imposing influence over public sentiment. The constitution and frame of our happy form of government gives cause to embarrassments and delicacy with the court and jury, in regard to the subject now to be passed upon. The functions of government are essentially in the hands of the people; they act directly upon all questions of a public character, and settle as electors the general policy of the government. Men are raised up and put down, not from regard or dislike to them as individuals, but from political considerations. From these reasons, parties will arise and be known through every portion of society. We have each of us, no doubt, been also called to act in the interesting matters recently agitating the public mind, and we may, to a greater or less extent, have enlisted our attachments with one or the other of the opposing parties which have been so spiritedly assailed or supported by the plaintiff or defendants. Political discussions are so conducted in this country as to identify principles and the persons who espouse them. All that is reprehended in the tenets and supposed

views of a party is imputed to the individuals composing the party : *so also every foible or vice of the party man is con-*sidered as belonging to the principles he advocates, and the entire body connected with him.   On the other hand, we are inclined to hold him clear of all offences who concurs with us in favourite political points, and to esteem him individually as immaculate as we do the principles he professes. Should prepossessions or antipathies of this character have affected our minds in respect to either of the parties to this suit, we are called upon now, by all that can solemnize and rectify the understanding and heart, to dispossess ourselves of their influence, and to feel that we are not to act upon these topics as electors or political partisans, but as judge and jurors.   We must know these parties, and the interesting matter connected with the cause, only as disclosed to us by the testimony.   We should endeavor to feel as if the suit was between men of high name and character, with whom and ourselves there was no common ties of attachment or resentment, and who reside not intimately with us, but in some other state or country ; and we may then pass upon the issue as between man and man unknown to us, or never heard of until placed before us for judgment.   Being possessed of this impartiality of mind, we may address ourselves to the consideration of the facts and circumstances brought out by the proofs and discussions.   The action is for publishing, in the defendants' newspaper, allegations against the plaintiff which are considered libellous.   The defendants admit they made the publication ; and if its tenor is to hold the plaintiff up to reproach, or to disgrace him, either in his official or private character, it is a libel, for, in respect to written and printed slanders, the law holds the publisher liable to an action for any malicious defamation, exposing the plaintiff to public hatred, contempt, or ridicule.

" Malice in making the publication need not be proved, it will be implied if the charge is false."   (To this portion of the charge the counsel for the defendants excepted.)

Is the publication libellous ?   To ascertain this, you will direct your attention critically to the publication, reading ·

ALBANY,
Dec. 1829.

King
v.
Root.

and understanding it according to the ordinary import of the language used. What representations respecting the plaintiff are made by it? It having been twice read to you, I will not occupy time by reading it at large again. The purport of it, as charged upon the record, is, that the plaintiff, being president of the senate, came into the senate on the day mentioned, staggering under intoxication; that he mounted the steps to the chair with difficulty by help of the railing; that he sat in the chair with an expression of countenance denoting drunkenness; that he was in an ungentlemanly and uncleanly habit of person and dress; that he conducted like a sot from the public kennels, and exhibited himself an object of disgust and loathing to the respectable audience collected in the senate chamber. I do not attempt to repeat the language of the publication in these particulars, nor to rehearse all the charges designated by the declaration. You will take the paper with you, and read the article over yourselves for your better information. My object now is only to lay distinctly before you those matters which have been urged on the part of the plaintiff as most offensive, and are insisted to have been proved on the part of the defendants. Enough has undoubtedly been stated in this summary of the charges, to manifest the libellous character of the publication; and indeed it has not been contended on the part of the defendants that it is not libellous and actionable. They assume higher grounds of defence—a ground of defiance. They put it on the record, and meet this action upon the issue, that all they have asserted of the plaintiff is true. It is, no doubt, familiar to you, that if this defence has been sustained by the proof, it amounts to a perfect answer and bar to the plaintiff's suit; and though much has been said to you of the malicious and vindictive motives of the defendants, yet, in the consideration of this branch of the case, their motive is to be laid entirely out of view." (To this portion of the charge the counsel for the defendants excepted.) "Should the scope of proofs and circumstances lead you to believe the defendants had no good end in contemplation; that they were instigated to these charges solely to avenge personal and political resentments against the plaintiff; still, if they

have satisfactorily shown the charges to be true, they must be acquited of all liability to damages in a private action on account of the publication. Indeed, if good motives and justifiable ends must be shewn, they might well be implied from the establishment of the truth of a charge, for the like reason that malice is inferred from its falsity." (To this portion of the charge the counsel for the defendants excepted.) "The defendants having undertaken to justify the libel, must make out on their part, affirmatively and clearly, the truth of the publication. It will not be sufficient for them to raise a doubt whether it may not be true, but the fact must be established with that degree of certainty always required to justify a verdict giving to a party any matter demanded by him." (To this portion of the charge the counsel for the defendants excepted.) "Neither will it be a good justification of various slanderous imputations, to prove a part of them true. All that is libellous in the publication must be justified. Damages must be given for such part, if any, as the defendants fail to support. They must make their proof as broad as their charges." (To this portion of the charge, the counsel for the defendants excepted.) "In doing this, they are not, however, called upon to show a correspondence to the letter between the proofs and the publication. They must make out substantially the truth of what they assert, and if they do this, no regard need be paid to the severity of epithets, or harshness of sentiment, under which it is represented. The law enforces no oppressive or unjust rule in requiring this. The defendants made their publication voluntarily; they were neither constrained by process of law to give it, nor was it communicated confidentially to those entitled to ask it; and according to all principles of reason and law, they must be deemed to have incurred the peril of substantiating what they have thus openly and broadly charged upon the plaintiff. You will accordingly ascertain with exactness what the substance and nature of these charges are, so that you may then estimate and apply the evidence, and determine whether they are proved to be true. If you understand the charge to be that the plaintiff was drunk on the occasion, that charge will

not be justified by proving him excited by liquor to any degree less than that of drunkenness.

A good deal of difficulty has occurred with various witnesses in explaining what they understood by drunkenness or intoxication, and probably the court and jury would experience like embarrassment in attempting to define, with precise discrimination, the one state of the other. In this case the attempt is not required, because we are to take the plaintiff's situation as stated and specified by the defendants in the libel. They have given it with great particularity ; and whatever it may be termed, such as they describe it they must satisfy you it in truth was at that time." (To this portion of the charge the counsel for the defendants excepted.) " Drunkenness may be proved in various ways. It would be considered direct and positive evidence to prove the plaintiff was seen to drink a quantity of ardent spirits sufficient to intoxicate an ordinary person, and which was followed by the usual apparent effect, or that he was discovered in a bodily condition unequivocally denoting a state of intoxication. Indirect proof may also be received, as the opinion of persons knowing the plaintiff, formed upon observation of his movements, actions, language, or tones of voice. When the bare opinion is given, you must consider carefully, both the personal acquaintance of the witness with the plaintiff, and his situation and opportunity for making observations at the time of which he speaks. When these particulars afford satisfactory evidence to the jury that the witness is qualified to judge, and advantageously circumstanced to make a correct observation, his opinion will be competent evidence to prove drunkenness, intoxication, or any other disordered state produced by spirituous liquors. When, however, the witness details the particulars upon which his opinion is formed, the jury must determine the adequacy or adaptation of those particulars to the conclusions drawn by the witness. The mere opinion then is to be of little or no account, and the matter is to be determined as if the circumstances noticed by him were alone stated by the witness, without any expression of his own sentiments upon them.

Much has been said about the liberty and privileges of the press, and that great liberality should be extended towards the justification, because of the danger of trammelling the press by exacting strict proofs in relation to communications made through it to the public. Whatever bearing these considerations may have upon another branch of the defence, they have no just application to this point. The defendants are responsible, in all respects, as if the charges had been made by them in any other manner and capacity than that of editors of a newspaper. They have no privilege in this respect not common to every correspondent to their paper, and every other individual in the community. Whenever they, as editors, assume the privilege of denouncing individual character, they do it under every responsibility that would attach to citizens in any other capacity. Their privilege is simply to publish the truth and nothing more." (To this portion of the charge the counsel for the defendants excepted.) " If they have proved substantially to your satisfaction that they have done no more than that, they are entitled to a free and prompt verdict of acquittal, however injurious the publication may have been to the plaintiff.

I am spared the necessity of rehearsing at large the proofs to this point, since the counsel for both parties have gone minutely over them, and do not appear to differ in their views of the evidence; and no doubt the essential particulars are brought back to your recollection. It is not to be disguised that there has been much contradictory testimony; and the difference between the representations of the various witnesses is more especially matter of regret, as it may afford occasion for you to apprehend that the testimony has been affected by the feelings of good or ill will of the witnesses towards the opinion of the respective parties, as it will not escape your remark that, with the exception of Mr. Haight, the adverse witnesses stood opposed to each other in political sentiments, and every one called by the plaintiff warmly espoused his sentiments, and opposed the political course of the defendants at the time alluded to: and all those called by the defendants decidedly objected to and opposed the political course of the plaintiff. Yet there is no doubt

ALBANY,
Dec. 1829.

King
v.
Root.

of the entire credibility of every witness upon either side. They are gentlemen of the first integrity and intelligence, and no inducement can be supposed in the case sufficient to lead them to misrepresent or withhold any fact within their knowledge, whatever the effect of such fact might be. They are rather to be understood as swearing to their impressions and inferences from the facts, than to different statements of the same facts; and these observations may account for this diversity, it being a variance of opinion between them rather than contradictory representations of the same thing; and, besides, they may not all have been equally well situated to observe the matters upon which the difference exists. Each witness giving his own impression of what passed under his notice, it will be important that you consider attentively the respective opportunities of the witnesses to ascertain the facts of which they speak, before you can determine the degree of credit they are to receive. Several witnesses called by the defendants have testified to the appearance of the plaintiff in the senate on the 5th of August, and their opinion of his condition. Messrs. Wheaton, Miller, Webster, Gardiner and Jordan speak particularly of observations made by them whilst plaintiff was in the president's chair; Mr. Clarke, of his appearance on entering the senate, and ascending the chair; and Mr. Jordan describes his appearance when he descended from the chair; Messrs. Lawrence and Nelson say nothing of the plaintiff's appearance, but concur in opinion and belief with the other witnesses named, that he was intoxicated, or rather, as they state it, that he was "under the influence of liquor." As has been before remarked, the jury are not to receive the mere opinions and belief of witnesses, unaccompanied by the circumstances from which they are derived, as direct positive testimony that the plaintiff was intoxicated; but only as evidence tending to establish that fact, and proper to be weighed with the other proofs in the case. The five gentlemen first named relate the appearance of intoxication they observed, and also express, in unreserved terms, their opinion that the plaintiff was intoxicated. You will consider, first, whether the appearances detailed of themselves indicate a state of intox-

ication, or may naturally be accounted for otherwise; and next the circumstances of advantage possessed by the witnesses for making their observations, and compare the latter with those of others giving a different opinion. Several of these witnesses remarked a high flush in the plaintiff's countenance. It appears there are two windows with crimson curtains at the west side of the senate chamber, the light through which would fall upon a person in the president's chair; and if the inflamed appearance of the plaintiff's countenance may be satisfactorily accounted for by the light of an afternoon sun shining through red curtains on his face, or to the excitement produced by earnest speaking in a summer's day—that appearance, of itself, would afford but slight evidence, and indeed ought not to be considered any proof of intoxication. The mode in which the plaintiff delivered his address, is a particular referred to by several witnesses as one indicating he was then intoxicated. It was said by some to have evinced unusual effort, and to have been done with great slowness and hesitancy. If his enunciation was slow and hesitating, from difficulty of utterance, confusion of thought, or the use of inapt expression, that would afford very proper and direct evidence of a state of intoxication. If, however, with equal propriety, it may be imputed to an endeavor to be distinct and precise in the arrangement of his address, and the selection of language, the effect of the evidence would be the other way, and would go strongly to establish his sobriety and clearness of intellect. But this particular will be entitled to little or no weight either way, if differently understood by the witnesses. Messrs. Wheaton and Lawrence represent his delivery as hesitating and perplexed; Messrs. Gardiner, Jordan and Clarke, as animated, vehement and violent, each noticing the plaintiff's articulation as one of the circumstances indicating his drunkenness. Various other witnesses state it to have been more calm and deliberate than his usual manner, and as apparently adopted with a view to render his ideas perfectly explicit; or, according to Mr. Bacon's impression, as resulting from debility of body. Should you deem the state of the plaintiff's complexion, and the manner of his utterance, important items

towards determining whether he was drunk or sober, it will be necessary to consider carefully the relative situation and number of the witnesses who speak to these particulars. Messrs. Wheaton, Webster and Miller were at a distance, as variously estimated, of 30 or 40 feet from the plaintiff; Mr. Webster the farthest off, and in the gallery. Mr. Jordan sat considerably nearer him, and when the plaintiff came down from the chair, after delivering his opinion, was directly by him, if not in conversation with him. They state his face was unusually florid and excited. Messrs. Lawrence, Gardiner and Nelson, were sitting very near the plaintiff, but did not observe his person. Mr. Gardiner believed him intoxicated from the tenor of his language. Mr. Nelson thought he was so, but assigns no reason upon which his opinion was founded. Messrs. Sudam and Bacon observed, before he spoke, that he was pale as from illness. Mr. Sudam had a conversation with him before he went into the chair, and Mr. Bacon stood directly by his side whilst he was seated. Many other witnesses had their attention fixed upon the plaintiff, but observed nothing uncommon in his countenance or dress. But was he intoxicated? That is the fact to be established. His countenance and deportment at the time are only referred to as circumstances conducing to prove or disprove that fact. Was he intoxicated as represented in the libel, and does the charge imply that he had not the exercise of his reason and understanding? As to the state of his mind, there appears to be no diversity of opinion among the witnesses. Almost all of them concur in saying that his address was delivered with clearness, and in language strong and appropriate in reference to the matter. No one pretends he was incoherent, or at all confused in the statement of his argument. The evidence of Mr. Sudam is also very direct and strong to this point. He conversed with the plaintiff upon the subject then to be decided, just before he took the chair, and observed no indications whatever of intoxication. These are all the points of the testimony with which the court will trouble you. You will, upon this most important branch of the defence, by a careful and dispassionate consideration of all the evidence, deter-

mine whether the defendants have succeeded in proving that the plaintiff was, on the 5th of August, in the situation they have represented him to have been. If the defendants have only published the truth, they had an unquestionable right to do that, and they must be acquitted. If the plaintiff has been falsely libelled, he is entitled to a verdict." (To this part of the charge the counsel for the defendants excepted.) " As, on the one hand, the defendants are only required to support the essential and substantial matters of their charge, so, on the other, the law holds a justification insufficient that fully proves a part of the libel, leaving other essential parts unsustained. The rule is, that the justification must be co-extensive with the slander.

There is a double aspect to the defence: if the defendants fail to justify, they may still offer evidence in mitigation of damages. Although the imposition of damages is placed by law wholly at the discretion of the jury, yet there are certain fixed rules which ought always to be regarded in determining whether, in a given case, damages should be mitigated or aggravated. In reduction of damages, the defendants have been permitted an unlimited examination into the plaintiff's general character for temperance, with a view to show it already impeached, and in general bad estimation as to the specific thing they have alleged against him. This is both because if it is his general repute, it may be presumed the defendants, under an honest reliance upon general report, have asserted things which, though not proved true, they have published without design to give currency to what they might otherwise be supposed to know was false, but more especially because damages being claimed for an injury to character, to show a destitution of character in this very respect, removes the ground upon which the claim of damages rests. The public are deeply concerned that individuals should acquire and maintain good characters. Such characters become a guaranty for the preservation of order, and a wholesome respect for the laws, and the proper education of the rising generation. The law will therefore secure, by its most powerful sanctions, the enjoyment of such character to those possessing it, and when wantonly and unjustly assailed, will punish

with severity the authors of the injury, and it will discountenance all endeavors of those of bad name to obtain damages on account of slanderous imputations; thus constraining men, by the hopes of protection and reward, and the dread of disgrace and the loss of money, to aim at a respectable and fair standing in the community of which they are members. But although a man has a bad general character, the law will not permit him to be falsely slandered, and will punish, with nominal damages at least and costs, those who so defame him; so, also, though his character be bad in some respects, this shall not even mitigate damages for falsely traducing him in others. These remarks indicate the rule to be observed in the present case. The defendants, in mitigation of damages, are entitled to show the plaintiff had a general reputation equivalent to what they have charged upon him. Unless their proof amounts to that, it can be of no avail to them. They cannot give evidence of general character in respect to temperance in mitigation of damages, unless such general character is of the same quality and degree charged in the libel." (To this portion of the charge the counsel for the defendants excepted.) "For instance, it cannot be permitted them to say the plaintiff was drunk, and an object of loathing and disgust at a specific time, and then diminish damages by proving him generally reputed to be addicted to the free use of spirituous liquors, and often exhilerated by them—more than one can call another a thief, and then prove, in mitigation of damages, that he was commonly believed guilty of petty trespasses upon his neighbors' property. You will accordingly, before you give any weight to this sort of evidence, see clearly that it bears out the specific charge; for it cannot be resorted to in diminution of the injury, unless it comes up to the offence imputed." (To this portion of the charge the counsel for the defendants excepted.) "It is not enough that the general character appears to be of a like description with that alleged in the libel, without it also is so to the same extent and degree; for you will remember that testimony is only offered as to the plaintiff's general character in relation to the matters stated against him in the publication: no at-

tempt is made to impeach his character for probity and moral worth.

The defendants have also been allowed, upon this point of damages, to prove they had probable cause for making these charges against the plaintiff. To do this, they have offered evidence to satisfy you that it was commonly reported and believed in Albany, at the time, that the plaintiff was in the condition represented in the libel. This kind of proof must also go as far as is required, in regard to general character. It must plainly appear that the defendants have asserted nothing more than was then matter of common report in Albany, respecting the plaintiff's condition and conduct in the senate chamber." (To this portion of the charge, the counsel for the defendants excepted.) "But another consideration is to be regarded in connexion with this subject. You will not only inquire whether such common opinion prevailed, but also ascertain from the whole evidence whether it influenced the defendants to make the publication. In the absence of testimony to this point, the law would presume the common belief entered into the contemplation of the defendants, and was the probable cause of the publication. The evidence is received to obviate the implication of malice resulting from publishing a defamatory charge not shown to be true. But if the plaintiff has been enabled clearly to satisfy you that the defendants acted under no such influence; if he has proved that the defendants rested the charges upon their own assertions, without any reference to, or knowledge of, such general belief, then the existence in fact of the common repute would afford no mitigation in their behalf." (To this last portion of the charge the counsel for the defendants excepted.)

"Some extraneous topics connected with the case ought, probably, to be noticed, before closing these remarks to you. They will properly enter into your contemplation, either in discharge of the action, or in reducing or augmenting the damages. Such are the relative situation and conditions of the parties, the probable effect of such imputations upon the character and feelings of the plaintiff, his own conduct, and, especially, the motives actuating the defendants. The

plaintiff has, for a quarter of a century, been emphatically the child of public favour. Every station, the suffrages of his immediate constituents could confer upon him, he has held, and has been conspicuously honoured by the confidence of the district and state. These advantages and honors were bestowed upon him, not for his personal distinction alone, but in consideration of services and benefits to be returned by him to the people who conferred them. The public had a right not only to the exertion of the talents and faculties with which he was so eminently gifted, but especially to a moral and wholesome example in the high and commanding stations to which he was advanced. To give himself up to a beastly habit of intoxication would prevent his rendering those talents useful to his country; and, greatly worse, would inflict a deep injury in disgracing the public character, and encouraging a pernicious vice by the influence of a great name and exalted station. If the plaintiff is proved to be such a man, especially if, in the discharge of his high office, he has disgraced himself and outraged public feeling by open acts of drunkenness, you need not be told from this place that he has no right to damages, and that the defendants should be at once acquitted from all responsibility to him; or if he has the common reputation of so conducting himself, you will impose on the defendants the least possible amount of damages. You should, and no doubt will, promptly mark by your verdict your disgust at a prostitution of character so degrading. It is abundantly manifest, from the whole course of the proofs, that the plaintiff has for many years indulged in the free and constant use of spirituous liquors. You will, no doubt, severely reprehend the practice. You will lament that a man of liberal education, placed in the most elevated places in society, and of pre-eminent talents, should jeopardize his health and usefulness, and the public claims upon him, by a course of ruinous or degrading dissipation. But if he has discharged all his public duties with ability and propriety; if he has no such general character as is fastened upon him by the libel, although he has

given way to the indulgence of his appetite in this respect in a way we should most strongly disapprove, yet you will remember that with his secret vices, or foibles, or infirmaties, we have no concern in this trial, and he has a right, as a citizen, to be protected from a gross and malignant libel: his feelings and those of his family are not to be harrassed by a wanton exhibition of him in a way not justified by the direct proofs or common fame; and under such circumstances, the case might well justify exemplary damage.

The situation of the defendants is also to be regarded, and the means at their command, and used by them, to give credit and circulation to the libel, and whether they promulgated it with malicious and vindictive feelings towards the plaintiff. They are men of talent and great personal influence, having under their control a paper circulating extensively throughout the United States, and of much weight upon political and literary topics. By these means they are enabled to give greater effect to their attacks upon the plaintiff, rendering their charges both durable and widely known. They are accordingly more deeply responsible to him for an attack upon his private and public character in that mode. It has, however, been strenuously urged in their behalf, that the plaintiff was a public man, and in a public station, and his character and conduct a matter of general concern, and that their employment as journalists imposed on them, the defendants, the duty of giving circulation to all matters of general interest, and if they have thereby injured the plaintiff, the offence ought to be more leniently dealt with on that account. There is no foundation in reason or law for the argument." (To this part of the charge the counsel for the defendants excepted.) " The public are only interested in knowing the truth; they do not require, on the contrary, they are deeply interested in preventing all unfounded detraction of public men, and the press is not put in the defendants' hands, and patronized as an instrument of private revenge, or the vehicle of their personal animosities. A trust of the most interesting and important character subsists between the public and the conductors of the press. It is that nothing but correct, and useful, and wholesome matters

shall be circulated, especially that no other shall be given as upon the personal knowledge of editors. In the present state of society, newspapers become almost elementary works of instruction; they are admitted into our families, to be read by our wives and children, and passed from member to member with the same unreserve that school books and books of worship are. They furnish aliment to the youthful thought and taste, and when badly conducted, they become the most mischievous poison. No one has his newspaper inspected, or cautions his family against the pernicious principles it may hold out for imitation, before allowing it to be read; but placing confidence in the moral sense and integrity of the publisher, it is permitted to be perused without check or restraint. The Psalm book, the Prayer book, and even Bible, are not more free to the use of our children. How important is it that *their* young minds should not be taught to entertain or vent coarse and opprobrious sentiments of others and that our public prints should not bring before them a constant exhibition of bad passions or scurrilous revilings of those with whom the editors chance to be at variance? The press is a most efficient engine, and when directed to the destruction of private character, few can withstand its power. What is the appeal? What the protection against it? Who listens to the cry of innocence, or regards the pain inflicted on the sufferer or his unoffending relatives? Does the public taste demand these bitter and unmitigated aspersions of private reputation which so crowd the newspapers of , the day? It cannot be. A more exalted and humane feeling pervades the community; and, in a fitting case, a jury could render no more meritorious service to the public, than in repressing this enormous evil. It can be done only by visiting, with severe damages, him who wantonly and falsely assails the character of another through the public papers. A vigilant watch should be kept over the editors of our journals, to prevent them becoming vehicles for the indulgence of private resentment. Yet, however aggravated the practice of traducing character so openly and virulently through the press may become, you must be cautious not to let your

ALBANY,
Dec. 1829.

King
v.
Root.

anxiety to check a great evil, lead you to do a great wrong to these defendants. They are called upon to answer for a specific injury, and if they have cleared themselves of that, no consideration of general expediency should induce you to punish them for offences not charged against them in this action; and in seeking to restrain the licentiousness of the press, you will be careful not to trammel fair discussion, nor punish truth, however painful it may be to those of whom it is published. If your verdict is for the plaintiff, the question of damages is submitted, under these observations, wholly to your discretion, that discretion, however, to be guided by your reason, and not by your passion; and the damages will be apportioned according to the nature of the injury, the motives of the defendants, and the relative situation and circumstances of the parties. The defendants had a right to describe the plaintiff such as he was; they are responsible to him in damages if they have maliciously and falsely libelled him."

The jury retired late in the evening under this charge, and having been out all night, came into court in the morning, and requested to be again instructed as to the proof of general character that might be received in mitigation of damages.

His honour the judge observed to them, " That the defendants may not give evidence of general character as to temperance in mitigation, unless of the same quality and degree charged in the libel." To which remark the counsel for the defendants excepted.

The jury again withdrew, and shortly after returned into court with a verdict for the plaintiff, with fourteen hundred dollars damages, and six cents costs.

At the August term, 1827, the defendants applied to the supreme court for a new trial, which at the following October term was denied. (See opinion of the supreme court delivered by the Chief Justice, 7 *Cowen*, 617 to 637.) Judgment was accordingly entered for the plaintiff, and a writ of error sued out to this court. The case here was argued by

*J. Blunt & J. Duer*, for the plaintiffs in error.

*B. F. Butler & J. Sudam*, for the defendant in error.

The following opinions were delivered :

By the CHANCELLOR.   There is no doubt in this case that the publication complained of was libellous.   It represented the lieutenant governor of the state as being in a state of beastly intoxication while in the discharge of his official duties in the senate; an object of loathing and disgust, blind with passion and with rum.   He is charged with outraging all order, decency and forbearance by attempting to address the senate in that situation, and when he had no more right to do it than any grovelling sot from the public kennel. These charges were made by the editors of a public paper, of extensive circulation, as facts within their own knowledge, and which had passed under their personal observation.   If the charges were true, the lieutenant governor was not only unfit for the station he occupied, but utterly unworthy of admission into the society of respectable people.   And if the statement was false, the case called for exemplary damages, unless there were strong circumstances in mitigation.   The jury pronounced the publication untrue, and awarded $1,400 damages to the plaintiff.   They were the constitutional tribunal to decide on the truth of the charges and to settle the amount of damages.   And, if no rule of law has been violated, this court has no right to interfere as to either of those questions.

Several objections are raised to the charge of the circuit judge ; and as one of these goes to the whole ground of action, that will be first considered.   The counsel for the defendants requested the judge to charge the jury, " that the belief of the defendants in the truth of the charge was proved, and did away the presumption of malice."   The judge did not so charge, but on the contrary he told the jury that malice in making the publication need not be proved ; that it was to be implied if the charge was false.   If all that the defendants had asserted of the plaintiff was true, it was a perfect answer and bar to the suit ; and that, in considering

ALBANY,
Dec. 1829.

King
v.
Root.

this branch of the case, the motives of the defendants were to be laid entirely out of view. After reviewing the testimony on the question as to the truth or falsity of the charge, the judge concluded his remarks, on that part of the case, by saying, "if the defendants have only published the truth, they had an unquestionable right to do that, and they must be acquitted. If the plaintiff has been falsely libelled he is entitled to a verdict." I can see nothing in the charge of the judge on this part of the case of which the editors of the American can justly complain. They suppose the proof was sufficient to satisfy the jury of their belief of the facts, as stated in the libel. But as the editors stated the misconduct of the plaintiff as a fact within their own personal knowledge, if the jury were satisfied the charge was false, what legal evidence had they to suppose the defendants believed otherwise?

It is supposed by the counsel of the defendants that an editor of a public paper may publish what he pleases of candidates for public office with impunity, provided he satisfies the jury he believed it was true; or that he had no ill will against the person injured. It is said in some of our law books that in actions for libels, or for verbal slander, malice is the gist of the action. But certainly this does not mean malice, or ill will towards the individual, in the ordinary sense of the term. If such were the case, an action would not lie against the proprietor of a paper for a libel published in his absence, or without his knowledge. In *Andres* v. *Wells*, (7 Johns. Rep. 260,) the supreme court of this state decided that an action would lie in such a case; and such is the settled law. In ordinary cases of slander, the term maliciously means intentionally and wrongfully, without any legal ground or excuse. Malice is an implication of law from the false and injurious nature of the charge. In this respect it is entirely different from actual malice or ill will towards the individual, which is frequently given in evidence for the purpose of increasing the damages.

In ordinary cases of slander or libel, it is not necessary to allege in the declaration that the words were spoken, or the charge published, maliciously. It is sufficient to aver that it was falsely and injuriously done. (Per Bayley, J. 6

Dow. & Ry. 303. Anon. F. Moore, 459. Style, 392. D'-
Anvers' Abr. 166. *Mercer* v. *Sparks*, Owen's Rep. 51. Noyes'
Rep. 35, S. C.) But there are certain privileged communi-
cations which are *prima facie* excusable, from the cause
or occasion of the speaking or writing. These are not, in
law, considered slanderous or libellous, although the party
has not the means of proving the truth of the allegations
made, or should afterwards discover he was under a mistake.
In such cases the communication is lawful, and there can be
no legal implication of malice. An action will sometimes lie
even in the case of a privileged communication, if a person
knowing the charge to be false, adopts that method of grati-
fying his personal ill will against the object of his malice.
But in every such case the plaintiff must shew actual malice
before he can recover. And that is a question of fact for the
determination of a jury. (*Gray* v. *Pentland*, 2 Serg. & Raw.
23. 4 id. 420, S. C. *Burton* v. *Worley*, 4 Bibb. 38. *Law*
v. *Scott*, 5 Harris & Johns. 438.)

In *Duncan* v. *Thwaites*, (5 Dow. & Ry. 462,) Bayley, J.
says, "if an action is brought against a man for calling an-
other a thief, would it be a good defence to such action for
the defendant to say, I really believed him to be a thief at the
time I said so ; and though I admit that what I said was cal-
culated to injure his character, yet I really acted most con-
scientiously, under a full belief that what I said was true.
Does the negative of malice destroy the right of action where
an injury results ? The mischievous effect to the party com-
plaining may be just as great as if it was intentional. It must
not be assumed that the absence of a malicious intention
would be an answer to the action." And Ch. J. Abbott, in
delivering the opinion of the court in the same case lays it
down as a general rule, that every act unlawful in itself and
injurious to another is to be considered, in law, to be done
*malo animo*, towards the person injured ; and that this is all
that is meant by a charge of malice in a declaration of this
sort ; which is introduced rather to exclude the supposition
that the publication was made on some innocent occasion,
than for any other purpose.

VOL. IV. 18

ALBANY,
Dec. 1829.

King
v.
Root.

In *Bromage & Snead* v. *Prosser*, (6 Dow. & Ry. 296,) the court set aside a verdict because the judge had submittted the question of malice to the jury, in a case where the communication was not privileged, and the truth of the charge was not proved. My own opinion of the law on this subject, and the distinction between ordinary slander and privileged communications, is there so fully and correctly stated, that it would be but a waste of time to state that opinion at length. In ordinary slander, the question of *malice* is never submitted to the jury, except in relation to the amount of damage. In privileged communications the defendant is entitled to a verdict unless there is evidence of *actual* malice.

The difficulty which existed in England, previous to Mr. *Fox's libel act*, was, that in criminal prosecutions the defendant was not permitted to give the truth in evidence ; and yet the jury were required to imply malice. But in civil cases the defendant was permitted to give the truth in evidence as a full justification. Such was declared to be the law by the judges at the time that bill was under discussion in parliament ; and there has never been any alteration of the law in England on this subject, in civil suits. The truth is there, a full justification.

It is however insisted that this libel was a privileged communication. If so, the defendants were under no obligation to prove the truth of the charge ; and the party libelled had no right to recover unless he established malice in fact, or showed that the editors knew the charge to be false. The effect of such a doctrine would be deplorable. Instead of protecting, it would destroy the freedom of the press, if it were understood that an editor could publish what he pleased against candidates for office, without being answerable for the truth of such publications. No honest man could afford to be an editor ; and no man, who had any character to lose, would be a candidate for office under such a construction of the law of libel. The only safe rule to adopt in such cases is, to permit editors to publish what they please in relation to the character and qualifications of candidates for office, but holding them responsible for the truth of what they publish.

ALBANY,
Dec. 1829.

King
v.
Root.

If the plaintiff has been injured in his caracter or his feel-ings by an unauthorized publication, it is the duty of the jury to award him a full compensation in damages, without ref-erence to any particular ill will which might have been en-tertained against him by the defendant. For the purpose of ascertaining what injury the plaintiff has probably sustained by the false accusation, the defendant may in all cases go into evidence of the general character of the plaintiff. In ordinary cases, a man whose character was previously bad would not be entitled to the same compensation in damages as one who had always sustained a fair and unimpeachable reputation. But if the plaintiff's character had already been tarnished, and the jury were satisfied he was, at the time of the slander, endeavoring by a course of good conduct to re-trieve his former character, that might be a reason for giving heavier damages against those whose slanderous reports might defeat such a laudable attempt on his part.

There is another view of this subject in which the ques-tion of actual malice becomes important with regard to the amount of damages. The jury may not only give such dam-ages as they think necessary to compensate the plaintff for his actual injury, but they may also give damages by way of punishment to the defendants. This is usually denominated exemplary damages or smart money. The plaintiff is there-fore at liberty to give evidence of actual malice and vindic-tive motives, on the part of the defendants, to increase the damages. On the other hand, the defendant may rebut all presumption of actual malice by showing facts and circum-stances which induced him to suppose the charge was true at the time he made it, although it afterwards turns out to be false. The object of this kind of testimony is not to create a suspicion in the mind of the jury that the charge is true, but to shew them that the defendant was not actuated by malicious motives. Hence no evidence of this kind can be given except such as actually was, or may fairly be presumed to have been known to the defendant at the time he made the charge.

If the charge is true, the defendant has another remedy by pleading the truth in bar of the action, which will be a com-

plete defence; but if he sets up such defence, which turns out to be untrue, it is a deliberate repetition of the slander on the records of the court, and it is then too late for him to allege that the original charge was made under a mistake. The jury are then to pass on the truth of the charge, and it would be destructive to the rights of the plaintiff to permit such evidence to go to them in connection with the justification. When the defendant goes to trial on the general issue only, such testimony may safely be admitted, as it only goes to reduce the damages by rebutting all presumption of actual malice. The *ex parte* statements of others, and circumstances of suspicion which had been communicated to the defendant, would not be legal evidence to establish a justification; and if they were given in evidence, in connection with other testimony which was legal, they would influence the opinions of the jurors, and might induce them to give a verdict in favor of the defendant, when they would not have given such verdict on the legal evidence of guilt alone. For this reason it was long a question of doubt whether evidence of general bad character could be given in connection with a justification. Some of the most recent decisions, both in this country and in England, seem to be in favor of allowing evidence of general bad character, although there is a justification. I am disposed to defer to those decisions, but am satisfied the rights of plaintiffs and the safety of those who are accused of crime will not allow the principle to be extended.

The testimony rejected by the judge was neither admissible as evidence of general character or of particular facts which had induced the defandants to make the charge in this case. They state the facts as within their own personal knowledge, without reference to the previous character of the plaintiff or the opinions of any person; and the judge correctly stated to the jury that the opinions of others were of no consequence, if they did not influence the conduct of the defendants.

The statement of the judge, that the defendants may not give evidence of general character as to temperance, unless of the same quality or degree charged in the libel, was fully explained by him, so that his meaning could not be misun-

derstood by the jury. The charge was certainly much more favorable to the defendants than the decision of the supreme court would have authorized, though I do not mean to say it was more so than the facts of the case required.

In aggravated cases of slander it is not only the right but the duty of the judge to present to the jury, in plain and intelligible language, the necessity and propriety of protecting private character against unwarranted calumny and abuse. Judges have at times been permitted to use very strong language in describing the character of a libellous production. In a case before the late chief justice, in speaking of the libel, he held this language to the jury: " The declarations contained in this pamphlet evince extreme depravity of heart in the defendant, and an utter disregard of every rule of propriety and every principle of honor; and altogether forming a tissue of expressions the most indecent, the most immoral, the most blasphemous, that ever were conceived in the heart or uttered by the tongue of man." *Trumbull* v. *Gibbons*, Judicial Repos. 1.) And although $15,000 damages were given in that case, I believe the counsel did not think of asking for a new trial.

If I do not mistake the meaning of the circuit judge in the case before us, some of the passages complained of in his charge were intended to protect the defendants against any improper effects which had been made upon the minds of the jury by an appeal to their prejudices. I infer from the charge that the plaintiff's counsel had alluded to the case of Judge Van Ness, or of some other individual ; and it was in reference to that the judge told the jury that the defendants were called upon to answer for a specific injury, and if they had cleared themselves of that, no consideration of general expediency should induce the jury to punish them for offences not charged against them in that action. If such was the case, it was perfectly right and proper, and the defendants certainly have no right to complain.

I cannot bring myself to the conclusion that any rule of law has been violated on the trial of this cause ; and I think the judgment of the supreme court should be affirmed as of

the term of this court immediately preceding the death of Verplank.

By Mr. Senator MATHER. In charging the jury on the trial of this cause at the circuit, the learned judge observed that it was not incumbent on the plaintiff to prove malice on the part of the defendants in making the publication; that malice would be implied if the charge was false. This, as a general proposition, is undoubtedly correct; but it ought to be observed, least we suffer ourselves to be misled by the broad and general terms in which it is expressed, that the malice in such case is *presumed* or *implied only*, as the rule itself purports. Every person is presumed innocent of any crime which may be charged against him until he is proved guilty. Whoever charges another therefore with any thing criminal is presumed to have made a false charge, and therefore to have acted maliciously, unless he shall be able to prove the truth of the charge, the burden of which proof he has assumed by making the charge. It is to be observed further, that the presumption of malice referred to is the presumption of law only. As soon as proofs are offered to enable a jury to judge of the truth of the charge, it becomes the province of the jury to inquire and adjudge in point of fact not only whether malice existed, but to what extent, and in what degree.

To satisfy the first part of the inquiry, whether malice existed or not, so far as regards the legal presumption of malice, the jury have only to look at the proofs offered in justification. This inquiry involves only presumptions of facts. If the proofs are sufficient, the legal presumption of malice is rebutted by the facts proved. For it is to be remembered that legal presumptions are not proof, but, (as expressed by Ch. Baron Gilbert, in his Law of Evidence, vol. 1, page 142,) only stand instead of facts until the contrary be proved. If the proofs on the other hand fail to establish the justification, then the presumption of law that malice is implied if the charges are false stands good, and a' verdict must, in such case, be rendered for the plaintiff. This is the whole scope and end of the rule of law with which the judge opens his

ALBANY,
Dec. 1829.

King
v.
Root.

charge of the jury. For, when the second inquiry arises, what is the extent and degree of the malice? an inquiry most materially bearing upon the amount of damages to be awarded to the injured party, the rule that malice is implied if the charges are false, no longer affords the least assistance. It then becomes material to look to the nature of the charges themselves, the relative situation of the parties, the circumstances attending the publication, and the probable causes existing, if any, which might be supposed to have induced the defendant to believe the charges true prior to publication.

If such probable causes are found to exist, it is manifest that they do more or less repel the presumption of malice with respect to the extent and degree in which it exists. It is self evident that it is an exhibition of a greater degree of malice for a person to publish a false charge, knowing it to be so, than to publish the same charge, supposing by mistake that it is true. I admit it would be wrong in any case to allow to the probable causes such force as to do away entirely the legal presumption of malice, founded on the falsity of the charges; for a person has no more right to prefer any charge against the character or conduct of another unless he can substantiate it by legal proof, than a jury would have, to pronounce an accused person guilty without such proof. If it should be asked, has not a person a right to speak or write whatever he honestly believes? the answer is obvious. No person is justified as a matter of course, in believing: it is not always honest to believe an injurious report which cannot be substantiated by sufficient evidence; and if the charge in a given case may be supposed to be true, and yet the proof of it not within the reach of the party, although he may believe it with more or less assurance, according to the apparent force of the evidence before his mind, still an honest regard to the peace of society, his own interest and self respect, should induce him to be silent. Before giving publicity to any charges injurious to the character of another, the same considerations should induce every person to weigh well not only the evidence of their truth

but the uncertainty and imperfections of all human tribunals in eliciting it. It is well for the repose of community : it is well for the peace of individuals, that the law imposes upon the accusing party the full responsibility of substantiating his accusations, or in default thereof, to stand himself convicted of falsehood and of malice. Still, on the question of damages we see that the consideration of probable cause is a most material inquiry. The existence of such cause shows that the accusing party had some reason to believe what he spoke or wrote was true ; and as we are under the necessity of forming most of our opinions as to facts not certainly known on that species of evidence, it follows that in proportion to the strength of the probability shown, in the same degree is the legal presumption of malice diminished. In that part of the charge of the learned judge which relates to this branch of the subject, it appears to me there is a material and fatal deficiency. In pursuing the subject further, I propose in the first place to show the defectiveness of the charge in this respect; and in the second place to show that the charge was erroneous on the subject of evidence relative to the plaintiff's general character, in mitigation of damages.

1. On the subject of probable cause shown in mitigation of damages, the doctrine of the judge is stated as follows :

" The defendants have also been allowed, upon this point of damages, to prove that they had probable cause for making these charges against the plaintiff. To do this, they have offered evidence to satisfy you that it was commonly reported and believed in Albany at the time that the plaintiff was in the condition represented in the libel. This kind of proof must also go as far as is required in regard to general character. It must plainly appear that the defendants have asserted nothing more than was then a matter of common report in Albany respecting the plaintiff's condition and conduct in the senate chamber." The judge then proceeds to observe, that " the jury should not only inquire whether such common opinion prevailed, but also whether it influenced the defendants to make the publication ; and that if it should appear that the defendants rested the charges on their own assertion, without any reference to or knowledge of such

ALBANY,
Dec. 1829.

King
v.
Root.

general belief, then the existence of such common belief would afford no mitigation in their behalf."

This is all that is contained in the charge on the subject of probable cause shewn on mitigation of damages. I observed that in this part of the charge there was a material and fatal defect. The defect I allude to is this: The judge in the first place admits the correct doctrine that probable cause may be relied upon in mitigation of damages: he then proceeds to call the attention of the jury to the evidence supposed to be relied upon by the defendants as shewing probable cause, and in so doing, selects the weakest point in the defendants' testimony on that subject, (the reports current in Albany,) and wholly overlooks the strongest, substantially as I consider, charging the jury that the evidence thus selected, and by him commented upon, was all they had a right to consider in mitigation of damages.

To show that I am not mistaken in giving this construction to the judge's language, I refer to the statements in the bill of exceptions immediately preceeding the charge, where it is found " that the evidence being closed, the counsel for the defendants did then and there insist" among other things " that if a verdict should be found for the plaintiff, the malice of the publication was taken away, and only nominal damages could be awarded; that the belief of the defendants in the truth of the charge was proved by the evidence, and did away the presumption of malice." This shows what the defendants claimed the judge should charge the jury on this part of the case. I might well predicate my construction of this part of the charge on the fact that the judge utterly neglected and refused to state to the jury this claim of the defendants, which I consider their strongest point on the subject of probable cause, and limits the inquiry of the jury to the single consideration of the reports current in Albany. But that such is the true construction of the charge is further evident, and I think conclusively settled, by the fact that his honor the chief justice, in delivering the opinion of the supreme court on this branch of the case, not only dissents from the circuit judge on the admissiblity of common report as evidence of probable cause in mitigation of damages, but enters into an

elaborate argument to shew that the proofs offered unsuccessfully in justification could not be relied upon in mitigation as evidence of probable cause. If it had not been considered that the silence of the circuit judge, and his neglect to charge on the last point as requested by the defendants' counsel, was equivalent to an express dissent from the doctrine asserted by the defendant's counsel, then surely there was no necessity that the supreme court should enter at all into the discussion of that view of the subject. His honor certainly did not intend in this respect to controvert the opinion of the circuit judge. The latter had not advanced any opinion in this respect in collision with that entertained by the supreme court. He was requested to do so, but refused the very thing which is complained of on the part of the defendants.

By referring to the testimony set forth in the bill of exceptions, it will be seen that eight witnesses on the trial of the cause at the circuit, on the part of the defendants, concurred in testifying that the facts stated in the libel were substantially if not literally true. It cannot be necessary to repeat their testimony here. It is somewhat remarkable that by comparing the several facts given in evidence by those witnesses, it will appear that as far as an opinion can be formed from their testimony viewed by itself, every harsh epithet contained in the libel, every unfavorable representation of the plaintiff's condition and conduct on the occasion specified, is sustained and verified, not by doubtful opinions, but by direct statements of facts occurring under the personal observation of the witnesses. From duly weighing this fact, a consideration arises on the subject of probable cause shewn in mitigation of damages, which appears to me to be of paramount importance on this part of the case, and a leading point in the cause on the part of the defendants.

If I mistake not, I have already shown that in proportion to the weight of probable causes tending to show the truth of the charges in any case, in that proportion the legal presumption of malice arising from the fact that those causes do not prove the truth of the charges is diminished.

A slight comparison of the testimony on the part of the plaintiff and defendants in this cause will, I think, satisfy any person that on the question of justification the preponderance in favor of the plaintiff, which was even admitted by the defendants' counsel on the argument, was at the best very inconsiderable. The plaintiff introduced *ten* witnesses, the defendants *eleven*. All the plaintiff's witnesses were present on the occasion alluded to in the libel, and concur in acquitting the plaintiff, according to their judgment, of the facts charged and they speak from personal observation. Eight of the defendants' witnesses were also present, and testify from personal observation, with equal positiveness, that the facts were true. There was no attempt to impeach the defendant's witnesses. One of the plaintiff's witnesses, however, does impeach the character for veracity of another witness on the same side. He states that the general character of that witness for truth and veracity was not good, though there was great difference of opinion as to it ; but that he would believe him under oath when his interest was not concerned or his feelings strongly enlisted, in which case he would not, for he believed he would then square his oath according to circumstances. After making due allowance for this circumstance, I am bound to believe with his honor the judge who charged the jury, that " there is no doubt of the entire credibility of every witness upon either side, and that they are gentlemen of the first integrity and intelligence." How, then, do they stand on the question of justification ? I desire it to be kept in mind that I am not here attempting to show that the justification was made out, but solely that the preponderance in favor of the plaintiff's side was exceedingly slight, a circumstance which, I trust, has been already, and will be yet more clearly shown, to be important on the question of mitigating damages. Ten for the plaintiff depose that the charges were not true ; eight for the defendants that they were true. Numerically there is a preponderance of two. But one of the two is strongly impeached as to character for veracity by another on the same side. The preponderance is therefore seen to be extremely slight.

The question then recurs with new force, how are we to determine what allowance to make in mitigation of damages? I answer, by reference to a principle already established. So far as the object of giving a verdict for the plaintiff in such case is to punish the defendants for malice in publishing the falsehood, the allowance in mitigation of damages is to be determined by estimating the weight of the probable causes given in evidence, and tending to show that in making the charges the defendants had reasonable ground for believing that they were publishing the truth. In this cause it has been shown that the preponderance of testimony in favor of the plaintiff below on the question of justification was very slight. That was done by showing that the evidence on the part of the defendants to establish the justification was very nearly of equal force to that by which it was rebutted on the part of the plaintiff. The circumtances thus given in evidence on the part of the defendants all existed prior to the publication complained of, and they transpired under the observation of the defendants, or of one of them, as well as of the witnesses; and hence we see that they fall under the description of probable causes leading defendants to believe and publish the charges. Their weight or tendency to produce conviction is measured and determined by the fact that but for a slight preponderance in the *number* of witnesses opposed, the defence would have been fully established. As the presumption of malice rests on the falsity of the charges, and as in this case that falsity was only proved or rather presumed from or by a slight preponderance of testimony, it follows that the presumption of malice in this cause has a very slight and narrow foundation to rest upon.

Hence, I cannot doubt that under the guidance of these principles the judge should have charged the jury that in case they should be of opinion that the evidence failed to establish the justification, they were still bound to consider whether it afforded the defendants probable ground to believe the truth of their publication; that if, in their estimation, it did afford such probable cause, they were bound to consider it in mitigation of damages, and to give it force in that respect so far as the object of their verdict was to punish malice, just to the

extent in which they should think it repelled the legal presumption of malice.

It certainly cannot be considered as very remarkable that the defendants should believe, on the testimony of their own observation, a fact which, under exactly similar circumstances, eight "gentlemen of entire credibility, of the first integrity and intelligence," also believed. Nor in my opinion does it require any tax upon credulity to allow that, believing that fact on such evidence, their motives in publishing it to the world, if at any, might have been only at a slight remove from honesty, good faith and a desire to promote the public interest. In the judgment of charity, which ought to guide all men in dealing out reprehension, under such circumstances the most that could be safely affirmed against the defendants for making the injurious charges in this case is, that they acted unadvisedly; that they did not, in deciding to publish their opinions, sufficiently consider that even if true, it would not be certain that they would be able to prove them when called upon in a court of justice; and that in penning their remarks, they had infused into them a spirit of asperity at once calculated to arouse the resentment of the accused and his friends, and to create and nourish a vitiated taste in the public at large for that style of newspaper discussion.

But I am called upon to vindicate this view of the case, not only against the charge of the circuit judge, but against the more direct arguments and opinion of the supreme court. That part of their decision which relates to the question now under consideration is as follows:

When the defendant undertakes to justify because the publication is true, the plea, or which is the same thing, a notice of justification is a republication of the libel. It is an admission of the malicious intent with which the publication was first made. And upon the trial the jury are instructed, that if the plea is false, it is an aggravation of the offence and calls for enhanced damages. Such a state of the case and such an instruction is totally inconsistent with the idea of mitigation resting upon the absence of malice. That is confessed upon the record. When, however, the defendant

does not by the pleadings admit the malice, then he may excuse his conduct by shewing such circumstances as disprove a malicious intent."

In applying these principles to the case in hand, the court go on to say, " When prosecuted, defendants do not disavow the malice, and claim exemption from damages by bringing themselves within some of the exceptions to the general rule as to the implication of malice. They come into court, and when they may be supposed to have ascertained whether they were mistaken in the first publication, deliberately assert upon the record that the publication is true. So far then from disclaiming malice they virtually admit it in the face of the court. They are clearly excluded then from the benefit of any defence based upon the absence of malice." I have thus extracted the substantial parts of the reasoning of the supreme court in order to give it its full force. Dissenting as I do from almost every idea contained in the extract, I shall be under the necessity of considering them separately.

The court say, " When the defendant undertakes to justify, &c. the plea or notice of justification is a republication of the libel. It is an admission of the malicious intent with which the libel was first made. The malice is confessed upon the record." What, I would inquire, is malice ? It is defined to be " badness of design, extreme enmity of heart or malevolence, a disposition to injure others *without cause* from mere personal gratification or from a spirit of revenge." The question then arises, does the failure of an attempt to justify show that the malice is in such case admitted ? I appeal to the first principles of moral rectitude and enlightened judgment to decide if I do not answer correctly when I say, such a state of things may or may not be construed as an admission or evidence of malice : all depends on the solution of a prior question with what intent did the party interpose such a plea or notice. If he did it knowing it to be false or from a reckless disregard to consequences, without having reasonable cause to suppose he could substantiate it, then I agree it may and ought to be considered as new evidence of malice or an admission of malice ; for it is a republication of that

which, by its utter falsity is legally presumed to be malicious, and I agree it may and ought, in such case, to enhance the damages.

But no man is bound to be infallible in pleading. If he pleads or gives notice of justification, sincerely supposing he can sustain such plea or notice by proof; if he has before pleading used all reasonable diligence to inform his judgment on that point, then the plea is very far from affording new evidence or being an admission of malice, and this too whether in fact it shall turn out that the plea is true, or the pleader mistaken as to its truth, or unable to prove it true; for the premises which I state in such case, the reasonable inquiry, the *bona fides*, show both in a moral and legal point of view the absence of that " badness of design or disposition to injure without cause, from mere personal gratification or spirit of revenge," in which malice consists.

But the court lay it down as a rule, that on a failure to sustain the justification, the plea or notice of course and in all cases is an admission of malice and of new malice. If a failure to sustain a justification does, necessarily, prove a libel to be false ; if it also proves it impossible that the defendant might have only erred in judgment in supposing that he could prove that which he could not ; if, in short, it proves that there is no such thing in this imperfect world as a man's being mistaken in judgment and still honest at heart, and that the guilt of one who errs in judgment is equal to that of another who errs wilfully, then and then only could I subscribe to the doctrine of the supreme court under consideration. We see, therefore, that in order to ascertain, on a failure of justifying, whether a plea or notice is an admission or new evidence of malice so as to enhance the damages, it is necessary to inquire into the motives with which the plea was interposed. Whose province is it to make that inquiry ? The doctrine of the supreme court assumes it to be the province of the judge on the bench. It goes further ; it assumes it not only to be the province of the judge to make the inquiry, but having made it, always to decide one way, to wit, that the motives were malicious. This rule of the court besides invading, in my opinion, the province of the

jury, is like a two edged sword. If the libel is false and the defendants' motives in setting up a justification actually malicious, it cuts as it ought ; if the libel is false, but the defendant in pleading a justification only mistaken in judgment as to his ability to sustain it ; or if it be true, and the party only unable fully to prove it, being guilty in those cases of too great a degree of frankness and a want of infallibility in pleading, the sword again cuts to an equal depth. Whether it ought or ought not in the last cases, and whether the judge's or jurors' hands should wield it, I submit to enlightened judgment, to common sense, and to those feelings of kindness and benevolence which ought ever to be consulted in forming opinions upon the conduct of men.

The court proceed to say, " Such a state of the case, (alluding to the failure of an attempt to justify,) and such an instruction to the jury (to give enhanced damages because the plea or notice admitted and republished the malice) is totally inconsistent with the idea of mitigation resting on the absence of malice." Let us view the two circumstances here joined, separately. " Such an instruction to the jury, (i. e. to give enhanced damages because the plea or notice admitted and republished the malice,) is inconsistent with the idea of mitigation resting on the absence of malice." The court, it is to be noted by way of explanation, had, in the sentence immediately preceding this, stated that it was the usual practice to instruct jurors on trials that if the plea was false it was an aggravation of the offence, and called for enhanced damages. I flatter myself it has been already made somewhat manifest, that if there is any such practice at the circuits or in any other courts in this state, it is erroneous in this respect; that as appealed to by the supreme court, it purports to be a general rule for all cases ; whereas it cannot be a correct rule except in cases in which the jury are not only satisfied that the libel is false and malicious, but that the defendant also knew or had reason to know that the plea was false when it was pleaded, or had omitted to use reasonable diligence to inform himself as to the propriety or expediency of setting it up ; in which last case we observed that the party might be justly charged with a reckless disre-

gard to consequences and want of seriousness and good faith, in pleading which, if not direct evidence of malice, are certainly nearly as inexcusable. The court then say, "Such an instruction to the jury, to enhance the damages on account of the repetition of the falsehood and malice in the plea, is inconsistent with the idea of mitigation resting on the absence of malice." I grant it; there is an entire inconsistency between them. But what right has the court to appeal to an incorrect rule, said to be adopted in practice at the circuit, and from the inconsistency of that rule with a principle under discussion, argue that the latter is also incorrect. I have shown that the supposed rule of the circuits needs a most important qualification. It is proper in a specified class of cases, and equally improper in another class. I grant it; but in so doing, I only grant a truism, that where a case is so clear that there is no doubt, not only of the malice of the original publication, but that the plea was interposed for the sole purpose of indulging anew a malicious disposition, it would be extremely inconsistent to ask a mitigation of damages on an allegation that there was no malice. A man would stultify himself by making such a request.

I now proceed to consider the second circumstance in reference to which the charge of inconsistency is brought against the doctrine which I have endeavored to shew to be salutary. "Such a state of the case (meaning after the justification has failed) is inconsistent with the idea of mitigation resting upon the absence of malice." I have necessarily anticipated much that need be said in answer to this allegation, in attempting to shew that the supposed rule adopted at the circuit is wrong in being stated by the court in such general terms as to include the class of cases in which a justification being set up, the preponderance of testimony which determines it to have failed is slight, and where, from that consideration and other circumstances, judgment of charity might be supposed to allow that the accusing party not only believed the charges to be true, but that he could also prove them. Here, again, it is alleged by the court that it is inconsistent to ask a mitigation of damages on an alleged ab-

ALBANY, Dec. 1829.

King
v.
Root.

sence of malice, because it is said the failure to justify shows malice.

It is necessary to observe in this place, that the views which I have advanced do not render it necessary for me to assert that the mitigation of damages in any such case is to rest on an *absence* of malice, strictly speaking; and, in this respect, the language made use of by the court appears to me to imply a misconstruction of the views which are advanced on the adverse side. It is admitted that if the justification fails, no attending circumstances are sufficient to shew an *entire* absence of malice. The legal presumption of malice resulting from the falsity of the charges is a good ground for a verdict for the plaintiff; but no person will contend that that presumption is in any sense directory to the jury in regard to the amount of damages. The degree of malice is an important consideration in settling that point. All that I contend for then is, that if the proofs offered in justification are sufficient to shew that the defendant had reasonable and probable cause to believe the truth of the charges at the time of publishing them, then the jury may consider such probable cause as shewing a less degree of malice to be punished than if no such cause had been made to appear.

One ground on which the court reject the evidence of probable cause in the cases adverted to is, that it was originally introduced to support a justification, and inasmuch as it was deemed insufficient for that purpose, it must also be held insufficient for any inferior purpose : e. g. as proof of probable cause. If the probable cause were a higher end or a more desirable object to the defendant than proof in justification, I admit there would be force in the argument; for it may well be said, that proof which is insufficient to shew the defendant had a probable cause for publishing a libel, is much more insufficient to prove he had a just cause. This is arguing from the less to the greater. But when the court say, on the contrary, " If the proofs are insufficient to support a justification, they are therefore to be held insufficient to show probable cause," it appears to me they argue from the greater to the less, which is illogical.

But the court say further that the justification, being unsupported by legal evidence, shews malice, a new malice; and they thence also argue that it is inconsistent to suppose that the circumstances offered in justification can be evidence of probable cause in mitigation of damages. The error of this reasoning will appear conclusively from the following considerations: In order to determine whether circumstances offered unsuccessfully in justification shew malice, it is indispensable, as a condition precedent, to inquire and determine whether they shew a probable cause, (it being conceded that they are insufficient to establish a juitification.) Malice is a " disposition to injure another *without cause*, from a spirit of revenge merely, or for personal gratification." To affirm, then, of any act that it is malicious, pre-supposes or implies that the actor was uninfluenced by any reasonable or probable cause. The supreme court, therefore, in affirming that a plea or notice of justification unsustained is evidence of malice, are plainly guilty of what logicians term a *petitio principii* or begging of the question.

To determine whether a plea of justification was interposed maliciously, must depend upon a due consideration of the circumstances or facts given in evidence in support of it. If those facts and circumstances, viewed separately from the testimony on the opposite side, were sufficient, as in the case in hand they certainly were to prove the truth of the plea: if, as in this case, the failure of those circumstances to produce such a result is to be attributed to the production of a greater number of witnesses on the adverse side, (all the witnesses being admitted to be of equal respectability,) it appears to me it would be in the highest degree irrational as well as unjust to infer from such evidence that the plea was interposed maliciously. On the contrary it would be just, in such a case, to infer that the pleader had in view and was actuated in pleading, by a consideration of probable cause of the most serious import ; or, in other words, that he was not actuated by malicious motives in pleading the justification. In regard also to the original publication, the same considerations would show that the charge of malice was for the most part removed ; and in giving a verdict for the plaintiff under

such circumstances, the jury would proceed not upon actual proof of malice, but upon the legal presumption only of its existence. The slightness of such presumption, the unsatisfactory nature of the conviction it produces as to the existence of malicious intentions, the cautious fear so justly entertained lest the punishment of the law should fall upon the head of the innocent, and a spirit of judicious discrimination between wilful falsehood on the one hand and a mistaken judgment proceeding on probable grounds on the other, are all and every of them considerations which should induce a jury to mitigate the damages.

2. I now proceed to the second point stated in the commencement of this opinion, to shew that the judge at the circuit charged the jury erroneously on the subject of proof of general reputation in mitigation of damages.

The exceptionable part of the judge's charge in this respect is found expressed in the following sentences : " Defendants, in mitigation are entitled to shew that the plaintiff had a general reputation equivalent to what they have charged upon him. Unless their proof amounts to that, it can be of no avail. They cannot give evidence of general reputation in respect to temperance in mitigation, unless such general reputation is of the same quality and degree charged in the libel. You will accordingly, before you give any weight to this sort of evidence, see clearly that it bears out the specific charge ; for it cannot be resorted to in diminution of the injury, unless it comes up to the offence imputed. It is not enough that the general character appears to be of the like description with that alleged in the libel, without it also is so to the same extent and degree." It is to be observed that the extract which I have given is the judge's summary of all the law supposes to bear on that branch of the subject.

The first observation which I deem it proper to make respecting the rule here stated by Judge Betts is this : the words used do not convey any definite idea to the understanding, and therefore it is impossible to apply such a rule to the facts in any given case. " Defendants in mitigation," says the judge, " are entitled to show the plaintiff had a general

reputation equivalent to what they have charged upon him, and unless their proof amounts to that, it can be of no avail." What was the libellous charge in this case? It affirmed nothing relative to the plaintiff's general character, but charged him with a particular course of conduct on a particular occasion. The question the fairly arises in considering the rule as stated by the judge, what course of general conduct in life is equivalent to the commission of one separate offence, or a series of particular offences all done on the same occasion? I confess if such a question were put to me, I could only say I know not how to answer it. I do not know any scales for the weighing of a man's course of life on one side, and a detached portion of it on the other, so as to say that one is equivalent to the other, or that one falls short of the other.

In another part of the charge, the judge stated to the jury " that it was abundantly manifest from the whole course of the proofs, the plaintiff had for many years indulged in a free and constant use of spiritous liquors;" and he characterises the degree of that indulgence by these words: " a course of ruinous or degrading dissipation." It is manifest therefore, that before any person could apply the judge's rule to the facts proved in this case, he would be under the necessity of first settling in his mind what indulgence for years in the free and constant use of spiritous liquors in a course of ruinous or degrading dissipation out of doors is equivalent to being intoxicated and behaving under that excitement in a particular manner in the senate chamber—an inquiry which I think the human mind unfurnished with powers to make. The word *equivalent* applied to such a subject cannot convey a definite idea to the understanding.

The next and subsequent sentences contained in the above extract seem to contain the expression of a similar idea with slight variations. " They cannot," says the judge, " give evidence of general reputation in respect to temperance in mitigation, unless such general reputation is of the same quality and degree charged in the libel." To understand this, presents the same difficulty. How can the quality and degree of a particular act, or of a number of particular acts, all done

on one occasion, be so compared with the general course of a man's life, and the general reputation growing therefrom, that it shall be said one is of the same quality and degree with the other ? He adds, " You will accordingly, before you give any weight to this sort of evidence, see clearly that it bears out the specific charge, for it cannot be resorted to in diminution of the injury unless it comes up to the offence imputed." I would here inquire, if there is not a manifest impropriety in affirming of any evidence as to a man's general character for temperance, that it can be supposed to bear out a specific charge of intemperance on a particular occasion, and a like impropriety in speaking of that proof as resorted to in diminution of an injury, which the judge says must come up to the offence imputed in order to have any weight. Certainly if the proof as to general reputation is capable of " bearing out the specific charge, and of coming up to the offence imputed," it would no longer need to be considered in diminution of the injury, or in mitigation of damages ; for in such case, what the judge has affirmed of it, would make it equivalent to a justification.

The judge closes this part of the charge by saying, " It is not enough that the general character appears to be of the like description with that charged in the libel without it also is so to the same extent and degree." I understand by this that the judge means that the proof offered as to general character is not entitled to any weight unless it goes the whole length or extent and degree of the libel, which verifies my former observation, that every sentence in the extract is substantially a repetition of the same thing. I do not however object to the repetition. The error of the judge in this part of the charge appears to consist in this ; He endeavors to establish a rule which, by its operation, shall destroy the effect of proofs relied upon relative to general reputation, on grounds strictly analogous to those on which, as I have attempted to show, the evidence of probable cause in mitigation was erroneously rejected. Proofs of probable cause were rejected wholly, because they failed to support a justification. Here proofs established fully an impeachment of character for temperance to a certain extent are to

ALBANY,
Dec. 1829.

King
v.
Root.

be rejected wholly, provided the jury shall think they do not show a character as flagitious as the libel would if true. The rule appears to me to proceed on another wrong principle. It seems to assume that a course of intemperance characterized by the judge as being "ruinous" and "degrading" extending through "many years" of a man's life, and proved by the common consent of nearly all the witnesses on both sides, is not so great an impeachment of a man's character for temperance as to prove him intoxicated on one public occasion only ; an assumption which I consider the very reverse of the truth. No single immoral act, though it may be attended with circumstances greatly enhancing its turpitude, can be supposed, after all, to involve so great an amount of guilt ; neither would it so seriously impair a person's general reputation with his acquaintances as a frequent repetition of the same immoral action through a series of years, though accompanied in the latter cases in the overt acts separately considered, with fewer circumstances to mark their criminality.

The judge's position, as far as I can understand its supposed force, proceeds upon another unfounded assumption, i. e., it seems to assume that after a particular charge, affecting a man's conduct for intemperance on a specified occasion, his general character for temperance is not to be considered as impeached at all, unless the several acts in common life on which the general character arises are, separately considered, equally outrageous with the particular acts charged in the libel. This assumption is also at war with the judge's own reasoning ; for from the manner in which he characterises the plaintiff's intemperance as "ruinous," "degrading," &c. I am constrained to consider that he admits it to be "abundantly proved on both sides," that the character of the plaintiff in respect to temperance was at least bad. Still, the purport of the charge seems to be that the jury should not give *any* weight to that acknowledged evidence unless they should be of opinion clearly that such impeachment set the plaintiff's general character in respect to temperance in as bad a light as it would be if the several acts or courses of conduct on which the general reputation was

founded were separately of the same quality, " extent and de-gree " of intemperance with the particular act charged in the libel, so as to " bear out and come up to the specific charge," as the judge also expresses it.

I am well aware that it is not proper in the impeachment of general character to go into proof of particular acts of misconduct; still it is to be borne in mind that general repu-tation is founded wholly on particular actions, and cannot be disparaged to any extent or degree beyond the character or description of the particular actions which viewed conjointly go to form the general character of the individual. If the charge of the judge in this respect is correct, the following consequence will inevitably follow : Although the general character of a party may be proved to be bad, and be of greatly disparaged fame in respect to a quality in dispute, still if the libel overrates the badness of it, even in the least de-gree, the jury must give just the same damages as they would for a character the most unsullied. The rule of judgment which is thus given to the jury and the consequences direct-ly flowing from it are in my opinion subversive of the first principles of morality and common sense. The supreme court in giving their opinion in this cause very justly re-mark, that a person of disparaged fame is not entitled to the same measure of damages as another whose character is un-blemished. The single remark certainly shows the entire fallacy of Judge Bett's reasoning. I conclude therefore that inasmuch as the judge admitted to the jury that the plaintiff's general character for temperance was disparaged to some extent, he should have instructed them that *so far* it was their duty to make allowance in mitigation of damages, not-withstanding the disparagement might not be considered as coming up to and bearing out the specific charge ; that in such a case damages should only be given for the excessive coloring, the over heated epithets and the mistaken facts im-puted in the libel which the attempted justification failed to support, and which were left uncorroborated even by general reputation, after all due allowance was made for the degree of disparaged character actually proved.

ALBANY,
Dec. 1829.

King
v.
Root.

In looking back to another part of the judge's charge I find a strain of argument on the subject of justification which by analogy so fully sustains my view of this branch of the subject that I here give an extract from it. On the subject of justification the judge observes, " All that is libellous in the publication must be justified. Damages must be given *for such part, if any, as the defendants fail to support.*" On precisely the same ground I contend that though a man's general character for temperance may be disparaged by a libel in too great an extent and degree, still, if the proofs in the case do disparage it materially in that respect, though in a less degree, the damages, to be awarded should be in proportion to the excessive disparagement and not to the value of a spotless character.

Here, again, I find myself called upon to defend my views against the arguments of the supreme court; for that court on this point, as on the other already discussed, take even higher grounds in excluding testimony than the circuit judge. After assigning reasons, they say, in conclusion, " In no point of view, therefore, was the testimony admissible under the pleadings, even without the qualification of the circuit judge." It is worthy of observation, however, that the difference between the two courts is more nominal than real. The supreme court reject the testimony wholly ; Judge Betts adopts a rule which I have shewn must in the end produce the same result ; for that the general reputation is incapable of " clearly and fully coming up to and bearing out the specific charge," is shown in every such case by the failure to support the justification, and it is only on the contingency of such failure that the learned judge gives the rule. " You will see clearly," he says, " that it bears out the specific charge, before you give any weight to this sort of evidence." It is said by the supreme court that the evidence of general character for temperance ought to be rejected, because the plaintiff would be taken by surprise, having no notice in regard to general character, and that the admission of such proof would be allowing the general character to be attacked in detail, whereas properly it should be attacked at large or in gross.

That the plaintiff in such case would not be taken by surprise, is manifest from the fact that the libellous charge itself, the declaration and the plea or notice of justification, indeed the very nature of the controversy between the parties, as well as their pleadings, all conspire to indicate the necessity of the plaintiff being ready to sustain his general character as to the offence imputed. Indeed that is the object mainly for which he commences his action, and his declaration sets out with an averment of his general good character, and particularly in reference to the charge imputed ; and as by the rules of pleading, an express notice of intention to give evidence in regard to general character is never admitted, it follows that a party plaintiff is never to expect any other notice of such intention than such as arises from the nature of the case itself. With regard to the objection that it would be suffering the general character to be attacked in detail, I admit, if the defendants in this case had offered to prove particular instances of intemperance as an impeachment of the general character, in that respect, the objection would have been good and within the adjudged cases ; but no such thing was attempted. The supreme court, however, close on this point by saying that if the evidence of general character had been offered on the general issue only with a view to shew there was no malice in the defendants, because in reality they only repeated what every one else did, and what the plaintiff's conduct led them to believe was the truth, a very different question would have been presented. The court, in making this distinction, appear to me to lose sight of the object for which proof is offered in respect to general character. The object of introducing such proof being to enlighten the minds of the jury on the subject of damages, there may exist the same necessity for such proofs in a case in which a justification has been pleaded with the general issue, as where the latter plea stands alone. A failure to sustain a justification does by no means prove the general character of the plaintiff to be good. I cannot therefore discover any reason why the jury should give the plaintiff more damages than his character really deserves, on the ground that the defendant has failed to sustain the particular charge

ALBANY,
Dec. 1829.

King
v.
Root.

according to his plea. Such a result would however be unavoidable in many cases, if proof as to general character is to be rejected in all cases were the defendant sets up a justification, with a plea of the general issue.

Before closing, I will refer to a few of the leading cases which will be found to bear upon the subjects discussed.

In Starkie on Slander, p. 410, it is said, " Though circumstances inducing a belief of the plaintiff's guilt in the mind of the defendant take away considerably from the malignity of his intention, yet, since they do not amount to a justification, there is still a *residuum* of malice sufficient to support the action."

*Larned* v. *Buffinton*, (3 Mass. R. 546,) was an action for slander: plea, general issue and justification. The defendant, in mitigation of damages, offered to prove that the plaintiff left his father before he was of age, and without property; that he was a transient or roving man; unmarried; lived in many places successively; traded horses; butchered and drove cattle, and owned no real estate. This evidence was rejected on grounds perfectly consistent with those which I have advanced. Chief Justice Parsons places the rejection on the ground that the rule of law in such cases will not admit particular facts which were not pertinent to the question of general character; and further, that the particular facts stated, if proved, would not have any tendency to mitigate the damages. The judge expressly admits that under the pleadings the plaintiff's general character was put in issue, but not the particular facts stated, and that the knowledge of those facts was wholly immaterial to the jury in meting out damages. He then proceeds to state a sensible distinction between circumstances proper under the general issue alone, which ought to be rejected under the general issue and a justification. In the former case, he may show the words spoken in the heat of passion. This he would reject under the justification because they were inconsistent. He adds as follows: " But we are not prepared to declare that there are no facts or circumstances for which the jury may mitigate the damages under a special justification of the truth

of the words in which he shall fail. Where, through the fault of the plaintiff, the defendant, as well at the time of speaking the words as when he pleaded his justification, had good reason to believe they were true, it appears reasonable that the jury should take into consideration this misconduct of the plaintiff to mitigate the damages." The principle advanced in this extract appears to me as fully warranting the admissibility of the probable cause in mitigation, which I have contended for in the case under review in this court. The observations of the learned judge relative to a supposed inconsistency between certain circumstances admissible under the general issue, and to be rejected under a justification being confined to the example he gives, i. e. of words spoken in the heat of passion, and to cases similar in principle, I fully concur in his position, and find nothing in the opinion but what confirms me in the views I have advanced above at large.

In the case of *Wolcott* v. *Hall*, (6 Mass. R. 514,) the plea was a justification only. The evidence offered and rejected was not of general character or of just grounds of suspicion, but of particular reports, i. e. that R. B. had charged the plaintiff with stealing cheese, and that E. G had charged the plaintiff with stealing wood. Ch. J. Parsons decided that the testimony was properly excluded, not on the ground stated in 2 Cowen, 813, by Mr. Justice Sutherland, because the defendant had justified, but solely on the ground that particular reports could not be received under any state of pleadings. "Evidence of general character," he says, "was not offered," plainly intimating that if offered even under that plea it might have been received.

In Selwyn's N. P. 804, it is stated, "That when the facts to be proved on the part of the defendants do not constitute a complete justification, as when they show a ground of suspicion not amounting to actual proof of the plaintiff's guilt, such facts may be given in evidence under the general issue in mitigation. In note 12 of the same page it is said that in *Elmer* v. *Merle*, before Lord Ellenborough, which was an action for words of insolvency, the defendant was permitted to prove that at the time there were rumors in circulation that the plaintiff's acceptances were dishonoured; and in a case

before Le Blanc, justice, that learned judge received evidence under the general issue that the defendant had been guilty of *attempts* to commit the crime imputed to him. (2 Campb. N. P. 253, 4.) In the case of the *Earl of Leicester* v. *Walter*, (id. 251,) the defendant was permitted to show that before and at the time of the publication complained of the plaintiff was generally reputed to be guilty of the crime.

The case of *Alderman* v. *French*, (1 Pick. R. 1,) is relied upon by the plaintiff below as establishing the doctrines of the supreme court in this case. The act of the legislature of the state of Massachusetts passed in 1826, ch. 107, considered in connection with that decision, certainly shows that the argument makes strongly against the plaintiff here. By the 2d section of that act it is provided that when the defendant pleads the general issue, and also in justification that the words spoken were true, such plea in justification shall not be taken as evidence that he spoke the words. It further provides : " Nor shall such plea of justification, if the defendant fails to establish it, be of itself proof of the malice of such words ; but the jury shall decide upon the whole case, whether such special plea was or was not made with a malicious intent." To show the weight which is to be given to a declaratory act like this, I cite the words of Kent, justice, in *The People* v. *Croswell*, (3 Johns. C. 375 :) " Although I admit that a declaratory statute is not to be received as conclusive evidence of the common law, yet it must be considered a very respectable authority in the case."

In *Bodwell* v. *Osgood*, (3 Pick. 379,) the action was for a libellous communication addressed to the committee of a school district, charging the plaintiff with a want of chastity. It was put to the jury to decide whether the act was malicious or not, and they were instructed " to find for the defendant, if they should be of opinion from the evidence that he acted from honest intentions, and believed that the charges in the supposed libel were true." " The deliberate publication of calumny, *when the publisher knows it to be false, or has no reason to believe it to be true, is conclusive evidence of malice.* It is clear that in the class of cases in which this ranges itself the question of malice is exclusively for the jury,"

In *Kennedy* v. *Gregory*, (1 Binney's Penn. R. 85,) it was decided by a majority of the court, that in an action for slander under a plea of the general issue and justification, when the proof is, that the defendant in reply to a question implicating the plaintiff, answered either "It is so," or "They say it is so," the defendant may give in evidence in mitigation of damages, that a person told him what he related. The reporter adds further: It seems also that when the slander is spoken without reference, the defendant may, in mitigation of damages, show that the slander was communicated to him by a third person. *Morris* v. *Duane* reported in the same volume, page 90, is a still stronger case. The action was for a libel—plea the general issue with a justification. Defendant offered to prove in mitigation, that he was not the original composer of the libel; but succeeding an editor then deceased, found the libel among the papers of the deceased on taking the office, and so published it. The reasoning of Chief Justice Tilghman is so solid and judicious in showing the propriety of such proof in mitigation, and so fully establishes the views which I have advanced in the case under consideration, that I shall insert the substance of it. "This case." he says "is not new to me. The effect of any evidence which a defendant may offer, is with the jury; the competency of it with the court. The question in this case is, whether the defendant is entitled to offer to the jury this letter with the explanation for any legal purpose connected with the cause. It certainly cannot be offered to prove the plea of not guilty, and it is no legal justification. But still, is it not material; can it be that like damages should be given against two defendants, one of whom received his information from such sources as were entitled to a certain degree of credit, while the other devised it of his own wicked imagination? I think it cannot. Such evidence certainly goes to the degree of malice, and must weigh with the jury according to the circumstances which attend it ; whether these circumstances are such as ought in reason to mitigate the damages, they will decide."

I deem it unnecessary for me to go through the whole range of cases adjudged in England on this subject. I ac-

knowledge that though there is a great clashing of authority on these subjects even there; still very many of their decisions tend to establish those rules of exclusion of light from the conscience and judgment of jurors which are sought also to be established here by the plaintiff. I admit that in a few recent cases the supreme court of our own state appear to have shown a disposition to follow in this respect, without discrimination, the precedents established in some cases in the English courts; and it is now for the first time presented distinctly to this court of the last resort to say by the determination of this cause whether in this state rules shall be adopted so obviously drawn from foreign tribunals; or that rules shall prevail, which I trust I have shown to be founded in sound sense, and to harmonize with the spirit of our own institutions.

My opinion therefore is, that the judgment of the supreme court ought to be reversed, and that a *venire de novo* should be directed to be awarded.

On the final question being put, shall the judgment of the supreme court be affirmed or reversed? the members of the court ranged themselves as follows:

*For affirmance*—The Chancellor, Senators E. B. Allen, S. Allen, Eaton, Hager, Hubbard, McCarty, McLean, Oliver, Rexford, Sandford, Schenck, Stebbins, Throop, Todd and Warren, 16.

*For reversal*—Senators Broughton, Mather, Maynard and McMartin, 4.

Whereupon the judgment of the supreme court was accordingly *affirmed* with costs.